IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 126,106

In the Matter of RICHARD K. DAVIS,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Oral argument held December 15, 2023. Opinion filed February 2, 2024. Published censure.

*Matthew J. Vogelsberg*, Chief Deputy Disciplinary Administrator, argued the cause, and *Gayle B. Larkin*, Disciplinary Administrator, was with him on the briefs for the petitioner.

*Richard K. Davis*, respondent, argued the cause and was on the brief pro se.

PER CURIAM:  This is an attorney discipline proceeding against Richard K. Davis, of Lee's Summit, Missouri. Davis received his license to practice law in Kansas in April 2013. Davis also is a licensed attorney in Missouri, admitted in 2016.

On February 25, 2022, the Office of the Disciplinary Administrator (ODA) filed a formal complaint against Davis alleging violations of the Kansas Rules of Professional Conduct (KRPC) related to (1) a complaint filed by Julie Ragsdale, a court reporter who alleged Davis hired her to appear for and transcribe a deposition; (2) a complaint filed by T.R., whose wages were mistakenly garnished by Davis; and (3) a complaint filed by Sedgwick County District Court Judge Eric Commer regarding Davis' conduct at a hearing over which Judge Commer presided. A panel of the Kansas Board for Discipline

1

of Attorneys held a hearing on December 8, 2022, and issued a final hearing report two months later.

In the Ragsdale complaint, the panel concluded Davis violated

- KRPC 1.15(a) (2022 Kan. S. Ct. R. at 372) (safekeeping property);
- KRPC 3.1 (2022 Kan. S. Ct. R. at 390) (meritorious claim in good faith);
- KRPC 4.1(a) (2022 Kan. S. Ct. R. at 403) (truthfulness in statements to others);
- KRPC 4.4(a) (2022 Kan. S. Ct. R. at 406) (respect for rights of third persons);
- KRPC 8.1(a) (2022 Kan. S. Ct. R. at 432) (false statement in disciplinary matters); and
- KRPC 8.4(c) (2022 Kan. S. Ct. R. at 434) (dishonest conduct).

In the Judge Commer complaint, the panel concluded Davis violated

- KRPC 3.5(d) (2022 Kan. S. Ct. R. at 396) (conduct degrading to tribunal); and
- KRPC 8.2(a) (2022 Kan. S. Ct. R. at 432) (false statement about judge's integrity).

In the T.R. complaint, the panel concluded clear and convincing evidence did not support a finding that Davis violated any rules of professional conduct.

The panel set forth its factual findings, legal conclusions, and recommended discipline in a final hearing report. The relevant portions of that report are set forth below.

2

. . . .

"28.     During all relevant time periods up until March 13, 2020, the respondent dealt with significant health conditions relating to his heart and on March 13, 2020, underwent heart transplant surgery. Before and after the heart transplant, the respondent was prescribed numerous medications, including steroids and anti-rejection drugs. The respondent's heart condition and medications had a substantial effect on him, such as feelings of weakness, effects on his temperament, confusion, and drowsiness. The medications taken by the respondent also have many other potential serious side effects, including ones that can affect temperament, mental processing, emotional health, behavior, and physical wellbeing.

"Case No. DA13,141

"29.     Attorney Lynn Russell scheduled a deposition of the respondent's client, L.Y., for January 8, 2018. The deposition was for a lawsuit between L.Y.'s business and C.H. C.H. was represented by Ms. Russell.

"30.     Ms. Russell had arranged for the services of court reporter Julie Ragsdale of Ragsdale Court Reporting, LLC. Ms. Ragsdale, in turn, arranged for TBC Video to provide videographer services.

"31.     Prior to January 8, 2018, the respondent had not participated in a deposition and had not been responsible for paying court reporter costs for a deposition.

"32.     In 2018, the respondent was a solo practitioner with no billing staff. The respondent handled all billing, accounting, and management of his firm at that time.

3

"33.    The January 8, 2018, deposition took place at 1:30 p.m. at the respondent's office. After Ms. Russell concluded deposing L.Y., the respondent asked Ms. Ragsdale if she and the videographer would stay as late as 5:30 p.m. so that the respondent could depose Ms. Russell's client, C.H. Ms. Ragsdale and the videographer agreed to stay, and the respondent deposed C.H. until just prior to 6:00 p.m.

"34.    Ms. Ragsdale completed transcription of the depositions. On January 18, 2018, Ms. Ragsdale emailed the respondent an itemized invoice for $714.70. This included an attendance charge of $37.50, which was half of the total amount of the $75.00 attendance fee. Ms. Ragsdale told the respondent that the transcripts would be sent to him once she received payment.

"35.    On January 23, 2018, TBC Video mailed an invoice to the respondent for the videographer services in the amount of $591.43.

"36.    On February 8, 2018, Ms. Ragsdale emailed the respondent again noting that she was 'leaving town for a few days and wondered if [the respondent] could get this invoice taken care of?' Ms. Ragsdale indicated she had the transcripts prepared and ready to send to the respondent.

"37.    A few minutes later, the respondent responded by email stating:

'I am waiting for payment from my client as we didn't have any remaining retainer on this case. She has been a good payer so I hope to have it soon. Also, the case has settled so we do not need the transcript copies any longer. Therefore, you are welcome to shred or otherwise trash those.'

"38.    On February 26, 2018, Ms. Ragsdale had not received payment on the invoice, so she emailed the respondent, stating: 'What is the status of my $714.70

4

invoice?' The respondent responded by email a few hours later, stating: 'I am expecting payment from my client soon. As soon as I have it, I will forward the same to you.'

"39.     On February 27, 2018, the respondent sent an email to his client, L.Y., advising her of the status of the case and attaching a final invoice for legal fees L.Y. owed the respondent. The respondent wrote:

> 'I have attached your final invoice to this email. Unfortunately, it includes the costs of mediation and depositions that I wish we could have avoided if [C.H.] (and/or his attorney) had wised up sooner. For your reference, I have submitted payment to the mediator on your behalf already. I have not paid the deposition fees and will do so once I receive your payment.'

"40.     The final invoice attached to the email was dated February 27, 2018, and states a total amount due to respondent as $2,814.70. The invoice was itemized and included an expense of $714.70 for 'Deposition Transcripts,' but did not include a charge for the TBC Video videographer services.

"41.     The respondent never billed L.Y. for TBC Video's invoice.

"42.     The respondent testified that he would have had to personally type or select 'Deposition Transcripts' from a drop-down menu in his billing software for it to show on the invoice in this manner.

"43.     L.Y. sent a check dated March 7, 2018, to respondent for $2,814.70. The respondent deposited this check into his firm's operating account on March 15, 2018.

"44.     Around March 19, 2018, Ms. Ragsdale spoke with the respondent on the phone. During this call, the respondent told her that he had received funds from his client and that the respondent had placed a check in the mail to Ms. Ragsdale.

5

"45.     The respondent had not placed a check in the mail to Ms. Ragsdale by the time of this phone call. In fact, the respondent did not provide any payment to Ms. Ragsdale until August 2018, when the respondent paid a small claims court judgment entered against him.

"46.     The respondent testified that his reference during the call to a payment was only for Ms. Ragsdale's $37.50 appearance fee. Further, the respondent stated that he used the term 'the check is in the mail' as a turn of phrase that did not necessarily mean that the check had actually been placed in the mail to Ms. Ragsdale but that the respondent intended to send it. The respondent acknowledged that he had not placed a $37.50 check in the mail to Ms. Ragsdale.

"47.     By April 3, 2018, Ms. Ragsdale emailed the respondent, stating: 'When we spoke over the phone last week, you said you thought the check was mailed a week ago Friday and I still have not received it. Can you check on it for me, please.' Ms. Ragsdale never received a response from the respondent.

"48.     On April 26, 2018, Ms. Ragsdale emailed the respondent another copy of her invoice for $714.70 as well as a copy of a small claims petition. In the email, Ms. Ragsdale told the respondent that if she did not receive payment within seven days, she would file the small claims petition and file a bar complaint. She recounted that four weeks prior, the respondent told her that his client provided the funds to pay her and that he had mailed a check to her. Ms. Ragsdale also stated her belief that the respondent was dishonest about having mailed the payment.

"49.     The respondent responded shortly thereafter by email, stating: 'We have no contract or agreement. We had no discussions prior to the deposition. I never agreed to your rates or charges. There is no contract or agreement between us, and you would be committing perjury if you file the petition that you provided below.'

6

"50.     On May 17, 2018, Ms. Ragsdale filed a small claims petition in Johnson County District Court, case number 18-SC-00210. Ms. Ragsdale and the respondent appeared for trial on July 9, 2018, presided over by Judge Robert Scott. At the trial, the respondent stated that because the deposition was originally scheduled by opposing counsel, he did not owe Ms. Ragsdale the one-half appearance fee ($37.50). Further, the respondent stated that he did not owe Ms. Ragsdale for the transcripts or any other fees.

"51.     At that hearing, the respondent stated:

'[Ms. Ragsdale] is trying to receive payment for something that was never delivered and never provided. It is not right to charge my client that fee and it is not right for me to pay it out of my pocket because, again, nothing was provided. Had we needed a transcript, I would have gladly paid for it because, again, that would have been then paying for something being provided.'

"52.     Ms. Ragsdale testified that the respondent asked Ms. Ragsdale and the videographer to stay later until 5:30 p.m. so that the respondent could depose C.H. The respondent agreed that he had both defended and taken a deposition that day.

"53.     Judge Scott found in favor of Ms. Ragsdale and entered judgment against the respondent for $714.70 plus interest. The court stated:

'I do know how depositions are ordered, I do know how depositions are paid for, and I find [the respondent's] actions to be abhorrent, unethical. And if [Ms. Ragsdale] doesn't file a complaint with the disciplinary committee, I am going to.'

"54.     Further, Judge Scott stated:

'If you take a deposition and you tell someone you want them to perform services, they have completed the contract . . . [t]hat is

7

basic contract law . . . . If you ask someone to do a job for you, then they have—it is a quantum meruit. And she performed her services for you.'

"55.     The respondent told Judge Scott that although he disagreed with the Court's decision, he would self-report the matter to the disciplinary administrator's office.

"56.     The respondent testified at the formal hearing that he now knows that the court's ruling was correct and he chose this defense in the small claims matter due to his inexperience with depositions and how they are billed.

"57.     On his way home from the trial, the respondent called then Disciplinary Administrator Stan Hazlett to notify him of the matter.

"58.     The respondent paid $848.73 to Ms. Ragsdale and Ms. Ragsdale subsequently filed a satisfaction of judgment with the small claims court.

"59.     The disciplinary administrator's office also received a complaint from Ms. Ragsdale.

"60.     In his response to Ms. Ragsdale's complaint, the respondent stated that he never requested the transcripts from Ms. Ragsdale, so he believed that he did not owe any money for the transcripts. The respondent did, however, state that he owed Ms. Ragsdale the $37.50 appearance fee.

"61.     The respondent further claimed in his response that after his spring 2018 phone call with Ms. Ragsdale, he 'had submitted a check for the half of the appearance fee that was apparently not received by Ms. Ragsdale.' However, the respondent had not mailed a check to Ms. Ragsdale. The only payment the respondent provided her was the $848.73 check to pay the small claims judgment in late summer 2018.

8

"62.     During an interview with the disciplinary investigator, on August 23, 2018, the respondent again stated that he sent a check for the appearance fee to Ms. Ragsdale.

"63.     On July 31, 2020, Mr. Hazlett requested a copy of any cover letter that the respondent mailed with the appearance fee check to Ms. Ragsdale as well as the respondent's trust account ledger showing an entry for the check he wrote and a deposit slip for client funds deposited to fund the check.

"64.     Later that same day, the respondent replied by email, stating:

'As far as Ms. Ragsdale, the client in question did not have a retainer or trust balance and was billed monthly. As such, she never had funds in trust. The original check to Ms. Ragsdale (for the appearance fee) came directly from the client and was forwarded to her, so no funds were cycled through trust (or any other account). I prefer to do this when I can as it is simpler from my perspective. I did not keep a copy of the check or a cover letter (which in retrospect I should have and this is something I am more meticulous about now). The check that was sent to Ms. Ragsdale following the small claims judgment was entirely my money and paid from my operating account. I did not ask the client to pay for the deposition because her case was closed and I had previously told her that less was owed. As such, it would be bad business to come back and ask for more money. Therefore, I viewed it as a cost I had to eat.'

"65.     No check for $37.50 was ever requested from L.Y. or sent to Ms. Ragsdale.

"66.     During the time the respondent and Mr. Hazlett exchanged emails, the respondent had just returned to the office following medical leave for a heart transplant.

9

The respondent did not have access to his records from his solo law practice as he was working with a different law firm. The respondent testified that he responded to Mr. Hazlett's emails based off his memory as opposed to review of his records for L.Y.'s matter.

"67.    In a March 10, 2022, email to Mr. Vogelsberg, the respondent stated that he had intended to bill L.Y. for the videographer expense for TBC Video instead of Ms. Ragsdale's deposition transcript expense. The respondent stated that 'up until your complaint that's what I thought I had done.'

"68.    Despite receiving payment from L.Y. and depositing that payment into his operating account on March 15, 2018, and despite his assertion that he meant instead to bill L.Y. for the videography services, the respondent did not timely pay TBC Video's invoice. After several attempts to contact the respondent for payment, TBC Video filed a small claims petition in Johnson County District Court on July 12, 2018, to collect the $591.43 owed. The respondent paid TBC Video in late August 2018.

"Case No. DA13,149

"69.    The respondent was retained by a residential property management company to collect a judgment against its former tenant, T.R.

"70.    After receiving some information about T.R. from his client and conducting a public records search, the respondent determined that a T.R. who worked for the Spring Hill, Kansas School District was the T.R. obligated to pay the judgment. The respondent entered his appearance in the case and caused a request for garnishment to be issued to the school district from T.R.'s earnings.

"71.    The garnishment was successful and remained in place for four months. On May 14, 2018, J.R., T.R.'s spouse, contacted the respondent and informed the respondent that he had garnished the wrong person.

10

"72.     The T.R. employed by the Spring Hill School District and married to J.R. had the same first name, middle initial, and last name as the former tenant T.R. who owed the judgment. The respondent did not have a record of the full middle name of the judgment debtor.

"73.     The respondent described J.R.'s contacts as profane, angry, and abusive and testified that J.R. contacted the respondent numerous times over a short period of time.

"74.     The respondent asked J.R. to provide additional information to verify that his wife was the wrong garnishee. J.R. provided the respondent with a copy of T.R.'s driver's license. The respondent told J.R. that he would review the information and get back with him within a few days.

"75.     The respondent emailed the driver's license image to his client the next morning and advised his client that his research showed that the date of birth and driver's license number did not match the information previously provided by the judgment debtor.

"76.     The client told the respondent that the signature on the driver's license was comparable to the judgment debtor's signature. Specifically, the client stated, 'if you look at the "R" on her check attached and the Driver's License' they are very similar. The client also stated that T.R.'s occupation matched that of the former tenant. The client further provided photos of the former tenant who owed the judgment and stated that she believed the driver's license photo provided by J.R. looked similar to the photos of the former tenant.

"77.     The respondent's client requested that the garnishment not be dismissed.

"78.     The respondent sent a follow up email to his client, advising her that because there was a possibility the wrong person had been garnished, he proposed that

11

the garnished funds be held in his trust account moving forward and that he send a letter to J.R. advising him of this.

"79.    At that point, the respondent stopped disbursing funds obtained from the garnishment to his client and held them in his trust account.

"80.    J.R. continued calling the respondent's office multiple times per day demanding the garnishment stop and the funds garnished be returned to his wife.

"81.    On May 25, 2018, the respondent sent a letter to J.R., noting that he had not received any communications from J.R.'s wife, T.R., directly. The respondent further stated:

> 'I have reviewed the information you provided and public records related to [T.R.] with my client and was unable to conclusively make a determination with regards to your claims. With that being said, we take your claims very seriously and want to ensure that this matter is handled in the most appropriate manner possible. As such, please be advised that we intend to proceed as follows.
>
> 'The check that was received from the Spring Hill School District subsequent to your inquiry and any other checks received during the below-described period shall be held in trust for the next thirty (30) days so as to provide your wife time to file a motion with the court requesting a determination with regards to the garnishment. If the appropriate motion is filed, we shall continue to hold any additional funds received in trust until such time as the Court makes a ruling at which time funds shall be distributed in accordance with the directions from the Court. If a motion is not filed within the next thirty (30) days, my client shall presume the garnishment order to be valid and all funds held in trust will

12

be released to my client. Furthermore, if we receive sufficient information in the interim to make a conclusive determination regarding this matter, we will notify you of the same and release the funds held in trust to your wife.'

"82.    No motion was filed on T.R.'s behalf with the district court to release the garnished funds.

"83.    J.R., through attorney Mark Logan, provided further information to respondent to help establish that T.R. was not the judgment debtor in the lawsuit.

"84.    The respondent recognized he may have erred in identifying the correct garnishee and hired a private investigator, at his own expense, to evaluate whether the T.R. being garnished was the judgment debtor. The respondent communicated to his client that the information provided through Mr. Logan and the private investigator's investigation led the respondent to conclude it was likely that the wrong T.R. had been garnished and that the correct T.R. worked for Osawatomie State Hospital.

"85.    The respondent further advised his client that he planned to return the garnished funds to T.R.

"86.    On June 15, 2018, the respondent filed a release of garnishment in the lawsuit, which released the Spring Hill School District garnishment of T.R.'s earnings. The same day the respondent issued a new garnishment for the T.R. who worked at Osawatomie State Hospital.

"87.    On June 25, 2018, the respondent mailed a check to T.R. for the collected funds to Mr. Logan. Shortly thereafter, the respondent received an email from Mr. Logan stating he was no longer representing J.R. and T.R. The respondent asked Mr. Logan if he would still receive the payment on behalf of T.R. Mr. Logan did not respond to this email.

13

"88.     J.R. continued to contact the respondent's office demanding immediate return of the funds. J.R. threatened to file a lawsuit against the respondent and his client.

"89.     By this point, the respondent had never spoken with or heard directly from T.R. On June 28, 2018, the respondent emailed J.R. a Settlement and Release Agreement that the respondent had prepared. The agreement required T.R. to attest that she was not the proper person whose earnings should be garnished and that she had authorized J.R. to contact the respondent's office regarding this matter.

"90.     The respondent stated his primary purpose in creating this document was to confirm that T.R. was the wrong garnishee, that T.R. was the one who would receive the funds, and that if it turned out T.R. was the proper garnishee, his client would be able to reinstitute the garnishment and pursue damages for the misrepresentation.

"91.     The Settlement and Release Agreement also provided that the return of the garnished funds to T.R. was contingent upon J.R. and T.R. jointly releasing and discharging the respondent and his client from all claims arising out of the collection lawsuit. The agreement also required that the parties keep all negotiations confidential and to make no disparaging comments about any of the parties. The agreement provided that if J.R. and T.R. breached the agreement, they would be responsible for paying the respondent's attorney fees and investigator costs, which totaled $2,150.00 at the time, and all other damages available to the respondent and his client.

"92.     Further, in the recitals of the Settlement and Release Agreement, the respondent included a clause that regarding his own investigation, his hired private investigator's investigation, and correspondence with his client, J.R., Mr. Logan, and the school district, 'the results of the review referenced above were inconsistent.' The respondent testified that he included this clause because there was evidence collected throughout his investigation that went both ways and although the respondent ultimately reached the conclusion that he had probably garnished the wrong T.R.'s earnings, that was based on a preponderance of the evidence standard, not 100% certainty.

14

"93.     T.R. and J.R. never signed the Settlement and Release Agreement.

"94.     On July 28, 2018, T.R. filed a complaint with the disciplinary administrator's office regarding the respondent's conduct. This complaint is the source for the docketed matter DA13,149.

"95.     The respondent testified that he asked J.R. and T.R. to sign the Settlement and Release Agreement in order to protect himself and his client. He said that J.R. and T.R. were free to negotiate the terms of the agreement. The respondent said he felt that protecting himself and his client was warranted based on J.R.'s behavior.

"96.     On November 13, 2018, J.R. sent the respondent a proposed revised version of the Settlement and Release Agreement, which removed the waiver of claims against the respondent and his client. The respondent stated that he approved these changes and asked if there were any other changes 'I missed.'

"97.     The respondent testified that the reason he held the funds from June 2018 until November 15, 2018, was because J.R. had replied to the respondent's June 28, 2018, email stating 'I'll get back to you.' The respondent expected a response from J.R. regarding the Settlement and Release Agreement, which never came. Upon advice of counsel the respondent kept the funds in his trust account until his counsel directed him to mail a check for the garnished funds to T.R. on November 15, 2018.

"Case No. DA13,579

"98.     In October 2015, M.H., Jo.H., and Ja.H. inherited a home located in Wichita, Kansas, after their mother passed away. The siblings could not agree on what to do with the home, so the home remained vacant until 2018 when M.H. filed a partition action in Sedgwick County District Court against Jo.H. and Ja.H. The property was also subject to a foreclosure matter.

15

"99.    M.H. was represented by attorney Mark Ayesh. Jo.H. and Ja.H. were represented by attorney David Morgan. Judge Eric Commer presided over the partition matter.

"100.    On July 9, 2020, Judge Commer ordered that the property be listed for sale under certain specified conditions, including listing the property with one of two real estate agencies. Mentor Capital, LLC ('Mentor'), a company that purchased and resold distressed properties in foreclosure, entered into a contract with M.H. to purchase the property for $90,000.00. Jo.H. and Ja.H. refused to sign the contract. The respondent was not involved in preparing or negotiating the contract.

"101.    Mentor hired the respondent after Mentor learned that the property was involved in probate proceedings. The respondent determined the property was the subject of the partition action in front of Judge Commer.

"102.    On August 25, 2020, M.H. filed a motion to compel the sale of the property to Mentor without the need for Jo.H. and Ja.H. to agree to the transaction. The respondent entered his appearance in the partition matter on behalf of Mentor as an interested party that same day.

"103.    Around this time, Mr. Morgan filed a motion to withdraw as counsel for Jo.H. and Ja.H.

"104.    On September 3, 2020, the court held a hearing via WebEx to consider M.H.'s motion to compel the sale to Mentor. The court first heard Mr. Morgan's motion to withdraw, which Mr. Morgan indicated was based on a disagreement with his clients over how to proceed. Judge Commer granted the motion.

"105.    Judge Commer then heard argument on M.H.'s motion to compel the sale to Mentor. The respondent appeared at the hearing as an observer on behalf of Mentor and did not make any arguments regarding the motion to compel. Ja.H., acting *pro se*, objected to the sale of the property to Mentor and stated he wished to purchase the

16

property himself. Judge Commer ultimately ruled that the property could be sold to Mentor according to the contract between M.H. and Mentor.

"106.    After this hearing, Mentor had a final 'walk through' of the home and refused to close on the contract with M.H. under its present terms. In an email to Mr. Ayesh, M.H.'s attorney, the respondent stated that Mentor had discovered severe flooding in the home's basement, alleging that M.H. did not ensure the sump pumps were turned on. Respondent communicated that Mentor was still willing to purchase the property for a reduced price.

"107.    On September 18, 2020, M.H. filed a second motion to compel the sale of the property, this time to a company called Northbound, Inc., for $65,000.00. That same day, the respondent filed a motion for Mentor to intervene in the partition action and asked the court to deny the motion to compel the sale to Northbound and order the property instead be sold to Mentor for a reduced price. Mentor had offered $65,000.00, $68,000.00, and $72,500.00 to purchase the property, all of which were rejected by M.H.

"108.    On September 21, 2020, Northbound made a cash offer of $80,000.00 to purchase the property, with a closing date of October 15, 2020.

"109.    On September 25, 2020, the court held a WebEx hearing on the pending motions. The respondent appeared and argued on behalf of Mentor as a party seeking to intervene in the matter. Ultimately, Judge Commer denied Mentor's motion to intervene and compel the sale of the home to it for $72,500.00. Because the original contract between M.H. and Mentor had a closing date of September 28, 2020, and was still active, the court ruled that M.H.'s motion to compel the sale of the property to Northbound was premature. If the contract with Mentor failed to close by September 28, 2020, the court ruled that M.H. could request a new hearing on her motion to compel the sale to Northbound.

17

"110.    The original contract between Mentor and M.H. failed to close. M.H.'s motion to compel the sale to Northbound was scheduled for hearing on October 2, 2020, via WebEx.

"111.    Just prior to the October 2, 2020, hearing, the respondent filed a limited entry of appearance on behalf of Ja.H. for the purpose of seeking an order compelling M.H. to sell the home to Ja.H. for $100,000.00. The respondent also filed a combined response to M.H.'s motion to compel the sale to Northbound and request to compel the sale of the property to Ja.H.

"112.    Attached to Ja.H.'s motion to compel sale to Ja.H. was a proposed contract, prepared by the respondent, who is also a licensed real estate broker, to purchase the home for $100,000.00. The contract, dated October 2, 2020, was contingent on Ja.H. obtaining financing within 45 days. The contract noted Ja.H. was not preapproved but would apply for financing within 10 days. The proposed contract had a closing date 'on or before December 30, 2020.'

"113.    During the October 2, 2020, hearing, Judge Commer questioned whether the respondent had a potential conflict of interest, considering the respondent had previously represented Mentor and now represented Ja.H. The respondent stated that Mentor was no longer interested in purchasing the property and was not a party to the action since its motion to intervene was denied. The respondent argued that Mentor's interests were not in conflict with Ja.H. The respondent told the court that both Mentor and Ja.H. had been informed of the potential conflict and had each signed written conflict waivers.

"114.    Judge Commer testified during the formal hearing that his concern about a conflict was based on the potential that the siblings may have a claim against Mentor for failing to close on the contract to purchase the property for $90,000.00. By later representing Ja.H. in his offer for more than $90,000.00, the respondent could negate any claims the siblings might have against Mentor. Judge Commer further explained, 'the argument could be made by Mentor Capital that, well, you really don't have any damages

18

because if the court had approved the sale [to Ja.H.] for $90,000 . . . you wouldn't have had any damage.'

"115.    The respondent testified, 'I still struggle with this a little bit because I don't see [the] argument how [Ja.H] could have a claim against Mentor even as a third party beneficiary when he refused to sign the contract.'

"116.    The respondent testified during the formal hearing, that Ja.H. contacted the respondent seeking his assistance in purchasing the property. Once the respondent's representation of Mentor ended, the respondent decided to assist Ja.H., believing Ja.H. should have the opportunity to purchase the property.

"117.    The respondent also testified during the formal hearing that he assisted Ja.H. pro bono, receiving no money in exchange for his legal or real estate broker services. Further, Mentor had communicated to the respondent that Mentor was no longer interested in purchasing the property and was not interested in any type of legal action against M.H., Jo.H., or Ja.H.

"118.    Mentor and Ja.H. both signed conflict waivers related to the transaction and partition matter. Ja.H. signed the waiver on October 2, 2020.

"119.    During the October 2, 2020, hearing, the respondent argued that it was in the parties' best interests to either approve the sale to Ja.H. for $100,000.00 or to reject the contract with Northbound and allow the property to be listed with a real estate agent, as was contemplated in the court's July 9, 2020, order.

"120.    Judge Commer ultimately granted M.H.'s motion to compel the sale to Northbound, reasoning that the partition action had been pending for two years, Ja.H. had been represented by prior counsel who could have previously assisted Ja.H. with financing and putting forward an offer, and the later closing date and risk that Ja.H.'s financing could fall through presented potential unnecessary delay. Judge Commer also

19

noted that he would be unavailable for the next 24 days, making it impossible for him to resolve any issues that could arise should Ja.H.'s contract fall through.

"121.    As Judge Commer explained the reasoning behind his order, the respondent began to interrupt him. At one point, Judge Commer stated: 'Sir, let me speak.' The respondent argued that it would be wrong for the court to allow the sale to Northbound and stated: 'What is happening to [Ja.H.] is an injustice this court should be ashamed of.'

"122.    After Judge Commer announced that the court would approve the sale of the property to Northbound, the following exchange occurred:

> 'MR. DAVIS: May I respectfully ask you to list [the home] for ten days even though it still had not closed under [the] contract [with Northbound]? What you are doing is an injustice, Your Honor.
>
> 'THE COURT: You said that before, Mr. Davis. I made my ruling.
>
> 'MR. DAVIS: I want you to know what you are doing is wrong to [Ja.H.]. I want it on the record what you are doing is wrong.
>
> 'THE COURT: I'm not going to argue with you. I've made my ruling.
>
> 'MR. DAVIS: You made the ruling you believe is appropriate. I want it on the record I believe what you are doing is wrong.
>
> 'THE COURT: You are arguing.

'MR. DAVIS: For more time listed seven to ten days no harm whatsoever. That would just prove the fair value of the property. [Ja.H.] is being railroaded here, Your Honor. It is not right. I want it on the record.

'THE COURT: Mr. Davis.

'MR. DAVIS: It is not right.

'THE COURT: You said that. You made your argument, Mr. Davis. That is one of the problems with these Web[Ex] remote hearings that your conduct just now was in contempt of the court's ruling because you are arguing with the court. I explained why I was making this ruling when I indicated to you I will be unavailable.

'MR. DAVIS: You can correct this, Your Honor. Your unavailability shouldn't affect [Ja.H.]. That's unjust.

'THE COURT: Mr. Davis, if you were present in the courtroom I would likely be finding you in contempt of court for direct contempt.'

"123.    After the hearing, Judge Commer submitted a complaint to the disciplinary administrator's office regarding the respondent's potential conflict representing Mentor and then Ja.H. as well as the respondent's conduct during the October 2, 2020, hearing.

"124.    On October 16, 2020, the respondent provided the disciplinary administrator's office a response to Judge Commer's complaint. In his response, the respondent made the following statements:

21

'I appreciate that a complaint from a judge will carry significant weight—as it should—but frankly, this complaint is completely frivolous and was filed by Judge Commer as retaliation for my willingness to point out that he was denying my client his rights and entering an unjust decision.

* * *

'Moreover, Judge Commer stated on the record that his reason for not requiring this property be listed on the MLS or providing the defendant an opportunity to purchase it was because Judge Commer was going on vacation so he wouldn't be available to monitor any disputes. In response to this, I stated that his vacation schedule shouldn't affect an individual's rights, which I am sure is why he sent this complaint as he was unhappy with me making that statement and that I didn't just sit there quietly and allow him to railroad this Defendant so he could go on vacation.

* * *

'Considering [Judge Commer] knew the complaint was without merit because I had already advised him waivers were obtained, I have to wonder if this complaint was intended to discourage an appeal of his decision.

* * *

'Judge Commer knew there was no ethical violation when he submitted his complaint. I should also note he never asked to view the conflict waivers (in camera or otherwise) and I would have happily obliged had he done so. Instead, Judge Commer submitted this complaint knowing that it was untruthful and that no violation had occurred. Moreover, it is my opinion that his frustration with my agreeing to represent [Ja.H.] (who he had

22

previously threatened to deny his right to participate in hearings) prevented him from making a fair and just decision based on the facts and law related to this case.

*  *  *

'Therefore [Judge Commer] has a desire to avoid this wrong decision being appealed.

*  *  *

'Judge Commer is just upset that I called out that he was not respecting the rights of my client and that his vacation should not be grounds for denying my client's requested relief.

*  *  *

'It is my hope that once you review this information, you will find this for what it is, which is a frivolous complaint filed by a judge in retaliation because he was being called out for treating my client unfairly and using his vacation as an excuse to deny relief to my client. This letter is his way of trying to punish me for having the courage to call out injustice when it happens and to try and prevent me from ever doing so in the future. Even entertaining this complaint would be a miscarriage of justice.'

"125.    Further findings of fact are stated in the Conclusions of Law section below as appropriate to support the hearing panel's findings.

"*Conclusions of Law*

"126.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated KRPC 1.15(a) (safekeeping property), 3.1 (meritorious claims and contentions), 3.5(d) (impartiality and decorum of the tribunal), 4.1(a) (truthfulness in statements to others), 4.4(a) (respect for rights of third persons),

23

8.1 (bar admission and disciplinary matters), 8.2(a) (judicial and legal officials), and 8.4(c) (misconduct), in the DA13,141 and DA13,579 matters as discussed further below.

"127.   The hearing panel concludes there is not clear and convincing evidence of a violation of the Kansas Rules of Professional Conduct in DA13,149 (the T.R. complaint). The disciplinary administrator's office alleged the respondent violated KRPC 1.15(b), 4.1(a), and 4.4(a) in DA13,149.

"128.   In the garnishment action, the respondent represented the property management company and thus had a responsibility to his client to protect its legal interests and gather adequate evidence to confirm whether T.R. was the judgment debtor before releasing the garnishment and collected funds. Had she chosen to, T.R. could have asked the court for a judicial determination at any time, but she did not. Instead, T.R. chose to have J.R. try to negotiate with the respondent and his client.

"129.   Initially, the respondent attempted to return the funds to T.R. in late June 2018 through attorney Mark Logan, relying on Mr. Logan's status as counsel for T.R. to confirm T.R.'s identity and position in the case. However, Mr. Logan emailed the respondent to tell him that he would not continue to represent J.R. and T.R. The respondent asked Mr. Logan whether Mr. Logan could relay the check to T.R., which the respondent had already placed in the mail to Mr. Logan. However, Mr. Logan never responded to this email.

"130.   When Mr. Logan ceased communicating with the respondent, the respondent sought to negotiate a settlement and release agreement with J.R. and T.R. Up to this point, J.R.'s contacts with the respondent had been aggressive, profane, and persistent. It is understandable that J.R. was upset and that he felt T.R.'s paycheck was wrongfully garnished. However, J.R.'s behavior should be taken into consideration when determining whether the respondent's subsequent conduct, aimed at protecting himself and his client, violated the rules of professional conduct. Further, the respondent had not ever met or spoken with T.R., so he also wanted to protect his client and himself from any potential claim that J.R. was not authorized to receive the funds on T.R.'s behalf.

24

"131.    The disciplinary administrator's office asserted that the phrase, 'the results of the review above were inconsistent,' in the proposed settlement agreement dishonestly indicated that it was unclear whether T.R. was wrongfully garnished, which made it appear that T.R. was receiving some form of consideration for signing the settlement agreement. '[T]he results of the review above' refers to the respondent's own research, his correspondence with relevant individuals, and an investigation by a private investigator hired by the respondent. The respondent testified that throughout the garnishment proceeding there were facts that went both ways, both in support and in contravention that T.R. who worked at the school district was the judgment debtor. While the respondent never reached a conclusion with 100% certainty that he had garnished the wrong person's earnings, he and his client ultimately concluded that they should refund the collected amounts to T.R. Therefore, there is not clear and convincing evidence that the quoted language was a knowingly false statement.

"132.    Moreover, the respondent was willing to negotiate the terms of the settlement agreement with T.R. and J.R. and was prepared to accept a version of the settlement agreement revised by J.R. and T.R. that removed much of the liability waiver language. In his June 28, 2018, email, J.R. told the respondent, 'I'll get back to you,' regarding the settlement agreement language and then did not contact the respondent about the agreement again until November 2018. The respondent sent a refund check to T.R. in November 2018.

"133.    Accordingly, the hearing panel concludes that there is not clear and convincing evidence that the respondent's conduct in the DA13,149 matter violated KRPC 1.15(b), 4.1(a), or 4.4(a).

"134.    Further, the disciplinary administrator's office alleged that the respondent violated KRPC 1.7(a)(2) in the DA13,579 (Judge Commer complaint) matter. Specifically, the ODA contends there was a substantial risk that the respondent's representation of Ja.H. would be materially limited by his responsibilities to his former client, Mentor. Further, the ODA asserts that the written conflict waiver signed by Ja.H.

25

failed to fully disclose the conflict, meaning the respondent did not obtain informed consent from Ja.H.

"135.    Testimony during the formal hearing indicated a potential claim by Mentor against the siblings and, conversely, a potential claim by the siblings against Mentor for failure to close the real estate sale contract for $90,000.00. In the conflict waiver signed by Ja.H., the respondent notified Ja.H. of potential claims Mentor may have against M.H. and the real estate agent for the way the real estate transaction was handled. The respondent did not, however, notify Ja.H. that there may be potential claims by the siblings against Mentor. The respondent noted during his testimony that he struggled to see how Ja.H. could have a claim against Mentor when Ja.H. refused to sign the contract. The hearing panel agrees.

"136.    For KRPC 1.7(a)(2) to be violated, there must have been a 'substantial risk' that the respondent's representation of Ja.H. 'will be materially limited by' the respondent's responsibilities to Mentor. KRPC 1.7(a)(2). The matter before Judge Commer was a partition action where each sibling was a separate party. M.H. signed the contract with Mentor on her own behalf only and then asked the court to rule that her brothers' signatures were not necessary to sell the property. Ja.H. refused to sign the contract to sell the property to Mentor. Therefore, it was reasonable for the respondent to conclude that Ja.H. did not have a viable claim against Mentor, and thus there was no substantial risk that the respondent's representation of Ja.H. would be materially limited by his former representation of Mentor.

"137.    The hearing panel concludes that the waiver signed by Ja.H. properly informed Ja.H. of all potential concurrent conflicts as required by KRPC 1.7(b). Accordingly, the hearing panel concludes there is not clear and convincing evidence that the respondent violated KRPC 1.7.

"138.    Finally, the Amended Formal Complaint alleged the respondent violated KRPC 3.3. No evidence was presented to support a violation of KRPC 3.3 and the disciplinary administrator's office did not argue the respondent violated KRPC 3.3 during

the hearing. Therefore, the hearing panel concludes that the disciplinary administrator abandoned this allegation. The hearing panel does not find a violation of KRPC 3.3.

"KRPC 1.15(a)

"139.   Lawyers must properly safeguard their clients' property. KRPC 1.15(a) specifically provides that:

> '(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state of Kansas. Other property shall be identified as such and appropriately safeguarded.'

"140.   On February 27, 2018, the respondent sent an email to L.Y. with a final invoice that states a total amount due to respondent as $2,814.70. The final invoice was itemized and included an expense of $714.70 for 'Deposition Transcripts.'

"141.   L.Y. sent a check dated March 7, 2018, to the respondent for $2,814.70. The respondent deposited this check into his firm's operating account on March 15, 2018.

"142.   Up to March 15, 2018, the respondent had not paid $714.70 for any deposition services in L.Y.'s case and the $714.70 was not fees owed to the respondent. Thus, the respondent was not permitted to place L.Y.'s $714.70 in his operating account.

"143.   The respondent admitted he violated KRPC 1.15.

"144.   Accordingly, the hearing panel concludes that the respondent violated KRPC 1.15(a) in the DA13,141 matter.

27

"KRPC 3.1

"145. 'A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.'

"146. During the small claims trial, the respondent claimed that because the deposition was scheduled by Ms. Russell, he did not owe Ms. Ragsdale the $37.50 one-half appearance fee. Further, the respondent claimed that he did not owe Ms. Ragsdale for the transcripts or any other fees.

"147. The only time the respondent asserted he did not owe the appearance fee was in connection with the small claims trial. At all other times before and after the trial, the respondent acknowledged that he at least owed the one-half appearance fee.

"148. Further, the respondent knew when he raised this defense that he had requested that Ms. Ragsdale and TBC Video stay later so that he could depose C.H.

"149. Judge Scott found in favor of Ms. Ragsdale and entered judgment against the respondent for $714.70 plus interest, ruling: 'I do know how depositions are ordered, I do know how depositions are paid for, and I find [the respondent's] actions to be abhorrent, unethical. And if [Ms. Ragsdale] doesn't file a complaint with the disciplinary committee, I am going to.' Further, the court stated: 'If you take a deposition and you tell someone you want them to perform services, they have completed the contract . . . [t]hat is basic contract law . . . . If you ask someone to do a job for you, then they have—it is a quantum meruit. And she performed her services for you.'

"150. The respondent acknowledged that Judge Scott's ruling was correct and attributed his defense to lack of experience with depositions and how they are billed.

28

"151. The respondent's asserted defense in 18-SC-00210 was frivolous and made without good faith argument for an extension, modification, or reversal of existing law.

"152. Accordingly, the hearing panel concludes the respondent violated KRPC 3.1.

"KRPC 3.5(d)

"153. 'A lawyer shall not . . . (d) engage in undignified or discourteous conduct degrading to a tribunal.'

"154. During the October 2, 2020, hearing before Judge Commer, the respondent interrupted Judge Commer as he was issuing his ruling. At one point, Judge Commer stated: 'Sir, let me speak.'

"155. The respondent was argumentative with the Court as it issued its ruling. The respondent used language with no substantial purpose other than to degrade the tribunal. For example, the respondent stated that the Court 'should be ashamed of' its ruling's effect on the respondent's client, that the Court was committing an 'injustice' and was 'wrong,' and that the respondent's client was being 'railroaded' by the Court's ruling.

"156. Judge Commer attempted to redirect the respondent multiple times to engage in appropriate conduct, but the respondent did not revert to engaging in appropriate conduct. Judge Commer stated that if the respondent were present in the courtroom as opposed to appearing via WebEx, the Court would have found the respondent in direct contempt of court.

"157. The hearing panel concludes that the respondent's conduct during the October 2, 2020, hearing before Judge Commer was undignified, discourteous, and degrading to the tribunal. Accordingly, the hearing panel concludes the respondent violated KRPC 3.5(d).

29

"158.    KRPC 4.1(a) provides that '[i]n the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.'

"159.    During a March 19, 2018, phone call, the respondent told Ms. Ragsdale that he had received the funds for the deposition from his client and that he had placed a check in the mail.

"160.    The respondent had not placed a check in the mail to Ms. Ragsdale by the time of this phone call. In fact, the respondent did not provide any payment to Ms. Ragsdale until August 2018, when the respondent paid a small claims court judgment entered against him for Ms. Ragsdale's invoice.

"161.    The hearing panel concludes that at the time of his phone call with Ms. Ragsdale [in] spring 2018, the respondent knew that he had not placed a check (for $37.50 or any other amount) in the mail to Ms. Ragsdale.

"162.    The hearing panel disagrees that the phrase 'the check is in the mail' is a turn of phrase that communicates that the person intends to send a check soon. The respondent's statement under the circumstances in this case would have led a reasonable person to believe that the check was actually in the mail, and the respondent knew this was not true.

"163.    As a result, the hearing panel concludes the respondent violated KRPC 4.1(a) in DA13,141 by knowingly making a false statement of material fact to Ms. Ragsdale.

"KRPC 4.4(a)

"164.    'In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person.'

"165.    For nearly three months, from February 8, 2018, until April 26, 2018, the respondent led Ms. Ragsdale to believe that the respondent planned to pay Ms. Ragsdale's invoice for the deposition and transcripts.

"166.    Then, on April 26[,] 2018, the respondent sent Ms. Ragsdale an email that stated: 'We have no contract or agreement. We had no discussions prior to the deposition. I never agreed to your rates or charges. There is no contract or agreement between us, and you would be committing perjury if you file the petition that you provided below.'

"167.    In the respondent's April 26, 2022, email to Ms. Ragsdale, the respondent denied the existence of a transaction that the respondent had acknowledged in communications throughout the months prior. Further, the respondent claimed Ms. Ragsdale would commit a crime if she exercised her right to ask the court to decide the matter and to seek to recover her damages.

"168.    The respondent's conduct had no substantial purpose other than to embarrass, delay, or burden Ms. Ragsdale. Accordingly, the hearing panel concludes that the respondent violated KRPC 4.4(a) in the DA13,141 matter.

"KRPC 8.1

"169.    Lawyers must cooperate in disciplinary investigations. KRPC 8.1 provides:

'[A] lawyer . . . in connection with a disciplinary matter, shall not:

31

'(a) Knowingly make a false statement of material fact; or

'(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from [a] . . . disciplinary authority, . . .'

"170.    During the disciplinary investigation, the respondent made false statements of material fact to the disciplinary administrator's office in his July 31, 2018, response to Ms. Ragsdale's complaint, to Investigator Eldon Shields, and to former disciplinary administrator Stan Hazlett.

"171.    In the respondent's July 31, 2018, response, sent to the disciplinary administrator's office, the respondent stated that he had 'submitted a check for the half of the appearance fee that was apparently not received by Ms. Ragsdale.' During Investigator Shields' interview of the respondent on August 23, 2018, the respondent told Investigator Shields that he sent a check to Ms. Ragsdale for the $37.50 appearance fee.

"172.    The respondent never sent a check to Ms. Ragsdale for the $37.50 appearance fee.

"173.    The respondent stated that he negligently told Investigator Shields things that are untrue. However, the respondent's false statements in his July 31, 2018, response and to Investigator Shields, made just a few months after the $37.50 check was purportedly sent, were made under circumstances that establish that the respondent knew the statements were false. At that time, the respondent was still in solo practice and had access to his solo firm billing software and files. The respondent's memory about whether he sent a check to Ms. Ragsdale would have been fresh at this time and he had access to the information needed to provide an accurate statement in his response and to Investigator Shields.

32

"174.    On July 31, 2020, the respondent told former disciplinary administrator Stan Hazlett in an email that: 'The original check to Ms. Ragsdale (for the appearance fee) came directly from the client and was forwarded to her, so no funds were cycled through trust (or any other account).' The respondent's statement in his email to Mr. Hazlett was false. The respondent did not request a check from L.Y. for the $37.50 appearance fee and no such check was sent to Ms. Ragsdale.

"175.    The hearing panel recognizes that at the time the respondent exchanged emails with Mr. Hazlett, the respondent had recently undergone a heart transplant surgery and was taking medications that likely would have had a significant impact on the respondent's ability to function and respond completely. But while the respondent's physical and mental condition at the time may mitigate the respondent's misconduct (as discussed further below), the statement to Mr. Hazlett was no less false.

"176.    The respondent asserts he did not have the information he needed to respond accurately to Mr. Hazlett, such as access to his solo firm billing records, and instead was responding based on his faulty memory. However, the fabrication of this very specific story could not have occurred based on a lack of memory. Either the respondent did not remember what happened and could have stated such to Mr. Hazlett, or the respondent did remember what happened. The hearing panel concludes that the respondent fabricated the story about asking L.Y. to send a check directly to Ms. Ragsdale to intentionally avoid providing Mr. Hazlett the requested documents. The circumstances suggest that the respondent determined the responsive documentation contained no indication that a check was ever sent to Ms. Ragsdale from his own account, and fabricated this story to mislead Mr. Hazlett.

"177.    Thus, the hearing panel concludes that the respondent's false statements in his response, to Investigator Shields, and to Mr. Hazlett were knowingly and intentionally made. The hearing panel further concludes that the respondent's false statements were of facts material to the disciplinary investigation.

33

"178.    Because the respondent knowingly and intentionally made false statements of material fact during the disciplinary investigation in DA13,141, the hearing panel concludes that the respondent violated KRPC 8.1(a).

"KRPC 8.2(a)

"179.    'A lawyer shall not make a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge.' KRPC 8.2(a).

"180.    In his October 16, 2020, response to Judge Commer's disciplinary complaint, the respondent stated the following about Judge Commer:

> a.      That Judge Commer's complaint was 'completely frivolous and was filed by Judge Commer as retaliation for [the respondent's] willingness to point out that he was denying [the respondent's] client his rights and entering an unjust decision';
>
> b.      That Judge Commer did not require the property be listed on the MLS or allow the respondent's client to purchase it because Judge Commer was going on vacation;
>
> c.      That Judge Commer 'knew there was no ethical violation when he submitted his complaint';
>
> d.      That Judge Commer submitted the complaint 'knowing that it was untruthful and that no violation had occurred';
>
> e.      That Judge Commer's [*sic*]was 'just upset that [the respondent] called out that he was not respecting the rights of [the respondent's] client and that his vacation should not be grounds for denying [his] client's requested relief'[;]

34

f. That Judge Commer's complaint was 'a frivolous complaint filed by a judge in retaliation because he was being called out for treating [the respondent's] client unfairly and using his vacation as an excuse to deny relief to [the respondent's] client.'

"181. The respondent made other comments similar to the above throughout his October 16, 2020, response.

"182. When asked about the statements in his response, the respondent testified:

'I can't tell you what Judge Commer's motives are. I can tell you what I thought they were that day. I can tell you what I think they were today and those aren't the same thing because things have happened between now and that day.

* * *

'And, you know, that's what I said, what I said when I said. Today it was dumb. Shouldn't have sent it. And I would take it back every time, 10 out of 10 times, if I got asked the question.'

"183. Judge Commer testified that he did not file his complaint in retaliation for the arguments the respondent raised at the October 2, 2020, hearing or for the respondent's claim that Judge Commer violated Ja.H.'s rights and entered an unjust decision. Further, Judge Commer testified that he did believe there was a substantial likelihood the respondent committed an ethical violation when he filed his complaint. Finally, Judge Commer testified he did not knowingly file a false complaint against the respondent, and he did not file the complaint to discourage an appeal of his ruling.

35

"184.    Judge Commer sent a complaint about the respondent's conduct to the disciplinary administrator's office because, after reviewing the Judicial Code of Conduct, Judge Commer believed 'there was a substantial indication that there had been a violation of the disciplinary rules that [he] was required by the Judicial Code to submit a complaint.'

"185.    The hearing panel concludes that the respondent's statements about Judge Commer's integrity were false and were made with reckless disregard as to their truth or falsity. Accordingly, the hearing panel concludes that the respondent violated KRPC 8.2(a).

"KRPC 8.4(c)

"186.    'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' KRPC 8.4(c).

"187.    The respondent engaged in conduct that involved dishonesty when he sent an email to Ms. Ragsdale stating that he had mailed a check to her in April 2018 when the respondent had not done so, stated in his July 31, 2018, response to the disciplinary complaint and to Investigator Shields that he had sent Ms. Ragsdale a check for the $37.50 appearance fee when he had not done so, and told Mr. Hazlett by email that he had directed L.Y. to send a check to Ms. Ragsdale when the respondent had made no such request of L.Y. and no such check was sent.

"188.    Accordingly, the hearing panel concludes that the respondent violated KRPC 8.4(c).

36

"189.    In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"190.    *Duty Violated*. The respondent violated his duty to his client L.Y., to the public, to the legal system, and to the legal profession.

"191.    *Mental State*. The respondent intentionally violated KRPC 8.1(a) and 8.4(c) and knowingly violated his duties in connection with the remaining rule violations.

"192.    *Injury*. As a result of the respondent's misconduct in DA13,141, the respondent wasted resources of the small claims court and injured his client L.Y. by placing the $714.70 payment into his operating account and converting it for his own use. The respondent only paid the deposition expense after being ordered to do so by the small claims court. Further, the respondent injured Ms. Ragsdale by unduly delaying payment for her services through misrepresentation and harassing conduct and causing her to expend unnecessary time, stress, and effort to collect the amount owed from the respondent. The respondent caused injury to the disciplinary system by making multiple false statements creating the need for additional resources to be expended to discover the truth. As a result of the respondent's misconduct in DA13,579, the respondent caused injury to the legal profession by making false statements that reflected poorly on the respondent and the profession and caused injury to the legal system by making false statements that interfered with the proper adjudication of the partition matter and with the disciplinary proceeding.

"193.   Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"194.   *Prior Disciplinary Offenses*. During the respondent's final semester of law school, in spring 2012, the respondent was admonished for an honor code violation for failing to disclose arrests and/or charges in nine separate criminal matters on his law school application. This resulted in a hearing before the Kansas Board of Law Examiners. According to the holding in *In re Black*, 283 Kan. 862, 156 P.3d 641 (2007), a prior proceeding before the Kansas Board of Law Examiners may be characterized as a prior disciplinary offense and considered an aggravating factor. The hearing panel may also give such evidence the appropriate weight in its consideration. *Black*, 283 Kan. at 877. The hearing panel concludes that the respondent's prior misconduct that led to admonishment and the Board of Law Examiners matter is an aggravating factor. However, this factor is given reduced weight due to its remoteness in time, the fact that the respondent self-reported the misconduct, and the fact that the Kansas Board of Law Examiners chose to allow the respondent to take the bar exam despite the misconduct.

"195.   *Dishonest or Selfish Motive*. The hearing panel concludes that the respondent's conduct with regard to Ms. Ragsdale and in the disciplinary investigation was motivated by dishonest and selfish motive.

"196.   *A Pattern of Misconduct*. The disciplinary administrator's office contends that the three disciplinary complaints show that the respondent engaged in a pattern of misconduct. However, the hearing panel did not find a violation in the DA13,149 matter. The rules violations in the DA13,141 matter and the DA13,579 matter are not similar to each other. The hearing panel concludes there was not a pattern of misconduct here.

38

"197.     *Multiple Offenses*. The respondent violated KRPC 1.15(a) (safekeeping property), 3.1 (meritorious claims and contentions), 3.5(d) (impartiality and decorum of the tribunal), 4.1(a) (truthfulness in statements to others), 4.4(a) (respect for rights of third persons), 8.1 (bar admission and disciplinary matters), 8.2(a) (judicial and legal officials), and 8.4(c) (misconduct), in the DA13,141 and DA13,579 matters. The respondent committed multiple offenses[.]

"198.     *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process.* The respondent made false or deceptive statements during the disciplinary investigation multiple times. The respondent falsely stated in his response to Ms. Ragsdale's complaint and to Investigator Shields that he had sent a check for $37.50 to Ms. Ragsdale, he falsely stated to Mr. Hazlett that he directed L.Y. to send a check for $37.50 directly to Ms. Ragsdale, and he falsely told the disciplinary administrator's office that Judge Commer filed a complaint against him as retaliation for arguing on behalf of his client. Further, the respondent told Mr. Vogelsberg in a March 10, 2022, email that he had intended to invoice L.Y. for the videography services instead of the deposition transcript services. However, the respondent had been sued by both Ms. Ragsdale and TBC Video in small claims court for payment of their invoices related to this deposition. If the respondent had intended to invoice L.Y. for the videography services, L.Y.'s March 7, 2018, payment of this invoice in full should have resulted in the payment of TBC Video's invoice in full. The hearing panel concludes that the respondent repeatedly submitted false statements and engaged in deceptive practices throughout the disciplinary investigations in DA13,141 and DA13,579.

"199.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"200.     *Physical Disability*. The respondent dealt with a significant health condition relating to his heart during all relevant times in this disciplinary matter. On March 13, 2020, he underwent heart transplant surgery. Before and after the heart

transplant, the respondent was prescribed numerous medications. The respondent's heart condition and medications had a substantial effect on his physical condition, such as feelings of weakness, effects on his temperament, confusion, and drowsiness. The medications taken by the respondent also have many other potential serious side effects, including ones that can affect temperament, mental processing, emotional health, behavior, and physical wellbeing. The hearing panel concludes that the respondent's physical condition had a significant impact on his conduct in the docketed matters here, including the subsequent disciplinary investigations. This is a compelling mitigating factor.

"201.    *Personal or Emotional Problems if Such Misfortunes Have Contributed to Violation of the Kansas Rules of Professional Conduct*. The respondent's heart condition and March 2020 heart transplant had a substantial impact on his mental and emotional state. The respondent testified that he spent a lot of time in the hospital in 2020, all while also being the primary source of income for his family. Further, the respondent testified that there were three times when he was in the hospital where he almost died. Understandably, he said that his emotional health is still a struggle today. All the misconduct in this case occurred during the time when the respondent's heart condition presented the most burden—leading up to and immediately following heart transplant surgery. It is clear that the respondent's emotional condition contributed to his misconduct, and this is also a compelling mitigating factor.

"202.    *Inexperience in the Practice of Law*. The Kansas Supreme Court admitted the respondent to the practice of law in April 2013. At the time of his misconduct, the respondent had been practicing law between 5 and 7 years and had not actively practiced for the first few years he was licensed. Further, the respondent was inexperienced in certain specific aspects of the practice of law, such as taking depositions. The hearing panel concludes that the respondent was inexperienced in the practice of law when the misconduct occurred.

40

"203.	*Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the Kansas Bar Association. The respondent is the immediate past-president of the Kansas Bar Association Young Lawyers Section. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by the testimony of Kansas Bar Association President Nancy Morales Gonzalez and Past-President Cheryl Whelan. The respondent also submitted numerous positive client reviews in his exhibits.

"204.	The evidence before the hearing panel presented a difficult set of circumstances under which to decide the appropriate discipline. Some of the conduct was quite troubling. However, the respondent's health condition during this time certainly contributed significantly to his misconduct. As a result, the hearing panel considered all possible types of discipline in analyzing the facts, rules violated, and aggravating and mitigating factors. In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.11	Disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury or potential injury to a client.'

'4.12	Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client.'

'4.13	Reprimand is generally appropriate when a lawyer is negligent in dealing with client property and causes injury or potential injury to a client.'

41

'4.14    Admonition is generally appropriate when a lawyer is negligent in dealing with client property and causes little or no actual or potential injury to a client.'

'5.11    Disbarment is generally appropriate when:

    '(a)    a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft; or the sale, distribution or importation of controlled substances; or the intentional killing of another; or an attempt or conspiracy or solicitation of another to commit any of these offenses; or

    '(b)    a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.'

'5.12    Suspension is generally appropriate when a lawyer knowingly engages in criminal conduct which does not contain the elements listed in Standard 5.11 and that seriously adversely reflects on the lawyer's fitness to practice.'

'5.13    Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law.'

42

'5.14    Admonition is generally appropriate when a lawyer engages in any other conduct that reflects adversely on the lawyer's fitness to practice law.'

'6.11    Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.'

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.'

'6.13    Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.'

'6.14    Admonition is generally appropriate when a lawyer engages in an isolated instance of neglect in determining

43

whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.'

'6.21    Disbarment is generally appropriate when a lawyer knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer or another, and causes serious injury or potentially serious injury to a party or causes serious or potentially serious interference with a legal proceeding.'

'6.22    Suspension is generally appropriate when a lawyer knows that he or she is violating a court order or rule, and causes injury or potential injury to a client or a party, or causes interference or potential interference with a legal proceeding.'

'6.23    Reprimand is generally appropriate when a lawyer negligently fails to comply with a court order or rule, and causes injury or potential injury to a client or other party, or causes interference or potential interference with a legal proceeding.'

'6.24    Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in complying with a court order or rule, and cause [*sic*] little or no actual or potential injury to a party, or causes little or no actual or potential interference with a legal proceeding.'

44

'6.31   Disbarment is generally appropriate when a lawyer:

'(a)   intentionally tampers with a witness and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding; or

'(b)   makes an *ex parte* communication with a judge or juror with intent to affect the outcome of the proceeding, and causes serious or potentially serious injury to a party, or causes significant or potentially significant interference with the outcome of the legal proceeding; or

'(c)   improperly communicates with someone in the legal system other than a witness, judge, or juror with the intent to influence or affect the outcome of the proceeding, and causes significant or potentially significant interference with the outcome of the legal proceeding.'

'6.32   Suspension is generally appropriate when a lawyer engages in communication with an individual in the legal system when the lawyer knows that such communication is improper, and causes injury or potential injury to a party or causes interference or potential interference with the outcome of the legal proceeding.'

'6.33 Reprimand is generally appropriate when a lawyer is negligent in determining whether it is proper to engage in communication with an individual in the legal system, and causes injury or potential injury to a party or interference or potential interference with the outcome of the legal proceeding.'

'6.34 Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in improperly communicating with an individual in the legal system, and causes little or no actual or potential injury to a party, or causes little or no actual or potential interference with the outcome of the legal proceeding.'

'7.1 Disbarment is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system.'

'7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system.'

'7.3 Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional, and causes injury or potential injury to a client, the public, or the legal system.'

'7.4     Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in determining whether the lawyer's conduct violates a duty owed as a professional, and causes little or no actual or potential injury to a client, the public, or the legal system.'

"*Recommendation of the Parties*

"205.    The disciplinary administrator recommended that the respondent be indefinitely suspended.

"206.    The respondent recommended that he receive a published censure, or, alternatively, be suspended for an unspecified period of time, to be stayed while the respondent is placed on probation according to the terms of his proposed probation plan.

"*Discussion*

"207.    When a respondent requests probation, the hearing panel is required to consider Rule 227(d), which provides:

'(d)     Restrictions on Recommendation of Probation. A hearing panel may not recommend that the respondent be placed on probation unless the following requirements are met:

(1)     the respondent complies with subsections (a) and (c) and the proposed probation plan satisfies the requirements in subsection (b);

(2)     the misconduct can be corrected by probation; and

47

(3)     placing the respondent on probation is in the best interests of the legal profession and the public.'

"208.   Rule 227(c) requires that the respondent 'establish that the respondent has been complying with each condition in the probation plan for at least 14 days prior to the hearing.'

"209.   The respondent's proposed probation supervisor, Cheryl Whelan, testified that she and the respondent had an initial meeting on November 29, 2022, just nine days prior to the formal hearing in this matter. The respondent's proposed probation plan and supplement to that plan require the respondent to have an initial meeting with his proposed supervisor. Many of the other proposed probation terms require this meeting to occur before they can be complied with. Because the respondent met with Ms. Whelan for the first time nine days before the formal hearing, the respondent did not comply with each provision of his proposed plan 'for at least 14 days prior to the hearing.' See Rule 227(c).

"210.   Further, the respondent engaged in dishonest conduct. Dishonest conduct cannot be effectively supervised on probation. *See In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013) ('Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.')

"211.   The hearing panel concludes that probation, on its own, is not appropriate discipline here. However, as discussed further below, the hearing panel concludes that probation could be helpful to the respondent to address the misconduct that was not dishonest in nature.

48

"212. Based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent be suspended for a period of 90 days. The hearing panel further recommends that after serving the 90-day suspension, the respondent be placed on probation for a period of two years according to the terms of his proposed probation plan and supplement to the original probation plan. Further, the hearing panel recommends that as a term of the respondent's probation, the respondent be required to obtain a psychological evaluation from a provider approved by the disciplinary administrator's office to determine whether the respondent is capable of practicing law professionally, which will include communicating with others honestly, completely, and with a professional temperament. The hearing panel recommends that the respondent be ordered to follow all recommendations of the psychological professional following this psychological evaluation.

"213. Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

If a disciplinary hearing panel finds misconduct and recommends discipline other than informal admonition, the matter proceeds to this court for hearing. See Supreme Court Rule 226(b) (2023 Kan. S. Ct. R. at 282). When this happens, the respondent and the ODA may file formal objections called "exceptions" to the hearing panel's factual findings or legal conclusions. See Supreme Court Rule 201(h) (2023 Kan. S. Ct. R. at 251) (defining "exception"). To preserve the issue for our review, a party must file an exception. Supreme Court Rule 228(e)(1) (2023 Kan. S. Ct. R. at 288). In the absence of a filed exception, the party is deemed to have admitted the factual findings and the legal

49

conclusions in the final hearing report. Rule 228(g). When there are no exceptions filed, our task is usually focused on deciding the appropriate discipline.

In this case, both Davis and the ODA filed exceptions to the panel's factual findings and legal conclusions. Thus, the panel's findings and conclusions are not considered admitted, which means we must determine whether attorney misconduct has been established by clear and convincing evidence before deciding the appropriate discipline. *In re Spiegel*, 315 Kan. 143, 147, 504 P.3d 1057 (2022). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009).

RULE VIOLATIONS

A. *The Ragsdale Complaint*

In the Ragsdale complaint, the panel concluded Davis violated KRPC 1.15(a) (safekeeping property), KRPC 3.1 (meritorious claim in good faith), KRPC 4.1(a) (truthfulness in statements to others), KRPC 4.4(a) (respect for rights of third persons), KRPC 8.1(a) (false statement in disciplinary matters), and KRPC 8.4(c) (dishonest conduct).

Davis concedes his failure to deposit a $714.70 expense payment from his client into his trust account violated KRPC 1.15(a). But Davis claims the remaining rule violations found by the hearing panel are not supported by clear and convincing evidence because his actions resulted from careless mistakes and inexperience and were at most negligent, rather than intentional or knowing.

50

1. *KRPC 3.1 (meritorious claim in good faith)*

During the small claims trial on Ragsdale's demand for payment of appearance and transcription fees, Davis argued he did not have to pay Ragsdale half the appearance fee because he was not the attorney who originally scheduled the deposition. The hearing panel concluded clear and convincing evidence supported a finding that Davis' argument was frivolous and not made in good faith, in violation of KRPC 3.1. The panel found (a) Davis acknowledged before and after trial that he owed half the appearance fee, (b) the only time Davis asserted he did not owe any appearance fee was at the small claims trial, and (c) Davis knew when he raised this defense that he had requested Ragsdale to stay later so that he could depose a witness. Davis takes exception to the panel's findings and legal conclusion, claiming that his argument to the trial court was not a frivolous one made in bad faith but resulted from his inexperience.

A majority of the court finds clear and convincing evidence supports the panel's finding that Davis violated KRPC 3.1. A minority of the court would find no violation of KRPC 3.1 based on a lack of clear and convincing evidence to support a finding that Davis' argument to the trial court was either frivolous or not made in good faith.

2. *KRPC 4.1(a) (truthfulness in statements to third person)*

The hearing panel concluded Davis violated KRPC 4.1(a) when he knowingly made a false statement of material fact to Ragsdale by telling her he had placed her check in the mail when knowing he had not done so. Davis takes exception to the panel's findings and legal conclusion, claiming he did not knowingly, but only negligently, misstated the truth to Ragsdale when he told her the check was in the mail.

51

A majority of the court finds clear and convincing evidence supports the panel's finding that Davis knowingly misstated the truth to Ragsdale in violation of KRPC 4.1(a). A minority of the court would find no violation of KRPC 4.1(a) based on a lack of clear and convincing evidence to support Davis knowingly misstated the truth.

3. *KRPC 4.4(a) (respect for rights of third persons)*

The hearing panel found Davis engaged in conduct that had no substantial purpose other than to embarrass, delay, or burden Ragsdale by telling her in an email that "[w]e have no contract or agreement. We had no discussions prior to the deposition. I never agreed to your rates or charges. There is no contract or agreement between us, and you would be committing perjury if you file the petition that you provided below." Davis takes exception to the panel's findings and legal conclusion, claiming that his response to Ragsdale was based on a good faith, although perhaps inexperienced, belief that he had no contract with her and that she would be committing perjury if she filed a small claims petition alleging he had failed to pay for contracted deposition services.

A majority of the court finds clear and convincing evidence supports the panel's finding that Davis sent the email to Ragsdale for no purpose other than to embarrass, delay, or burden Ragsdale in violation of KRPC 4.4(a). A minority of the court would find no violation of KRPC 4.4(a).

4. *KRPC 8.1 (false statement in disciplinary matters)*

The hearing panel found that, during the disciplinary investigation, Davis made two false statements of material fact to the ODA.

52

1. In his July 31, 2018, response to Ragsdale's complaint, Davis falsely told Investigator Eldon Shields that he sent a check to Ragsdale for the $37.50 appearance fee. Davis concedes this statement was false but claims it was made negligently. The panel disagreed, finding he knowingly made the false statement because (a) it was just a few months after the check purportedly was sent and (b) he had access to his firm billing software and files to verify the veracity of his statement.

2. On July 31, 2020, Davis falsely told Stan Hazlett in an email that the $37.50 appearance fee check came directly from the client and was forwarded to Ragsdale. Davis concedes this statement was false but claims it was made negligently.

The court finds clear and convincing evidence supports the panel's finding that Davis knowingly made two false statements of material fact to the ODA.

5. *KRPC 8.4(c) (dishonest conduct)*

The hearing panel found Davis engaged in conduct involving dishonesty when he (a) sent an email to Ragsdale stating he had mailed a check to her in knowing he had not done so; (b) stated in his July 31, 2018, response to investigator Eldon Shields that he had sent Ragsdale a check for the $37.50 appearance fee when he had not done so; and (c) told Hazlett by email that he had directed L.Y. to send a check to Ragsdale when Davis had made no such request from L.Y. and no check was sent. Davis concedes he made these three statements and each of them was false. But Davis takes exception to the panel's finding that he knowingly violated KRPC 8.4(c), claiming he made the false statements negligently.

53

The court finds clear and convincing evidence supports the panel's finding that Davis knowingly made three false statements of material fact to the ODA in violation of KRPC 8.4(c).

B. *Judge Commer Complaint*

Judge Commer filed a disciplinary complaint reporting a "substantial likelihood" that Davis violated "KRPC 1.7 and/or KRPC 1.9(a) and/or maybe 3.5(d)."

KRPC 1.7 (2023 Kan. S. Ct. R. at 342) and KRPC 1.9(a) (2023 Kan. S. Ct. R. at 358) generally prohibit a lawyer from representing a client if the representation involves a concurrent conflict of interest with a former client. KRPC 3.5(d) prohibits a lawyer from engaging in undignified or discourteous conduct degrading to the tribunal. Nearly all of Judge Commer's complaint focused on facts relating to the potential conflict of interest. Judge Commer included only limited facts in the two-page complaint relating to conduct degrading to a tribunal.

In his response, Davis addressed only the part of Judge Commer's complaint alleging the conflict of interest allegations, which he adamantly denied. Davis cited the hearing transcript, which reflects he told Judge Commer at the hearing that all parties were informed of the potential conflict and signed conflict waivers. Because Judge Commer knew there was no conflict of interest, Davis alleged the complaint was "completely frivolous" and filed in retaliation for his criticism of Judge Commer at the hearing, in which he basically accused the judge of railroading his client's interests in an unjust decision so the judge could go on vacation.

54

The ODA ultimately filed a formal complaint against Davis alleging he violated KRPC 1.7 (conflict of interest), KRPC 3.3 (2022 Kan. S. Ct. R. at 391) (candor toward the tribunal), KRPC 3.5 (conduct degrading to tribunal), and KRPC 8.2 (false statement about judge's integrity).

The hearing panel concluded clear and convincing evidence did not support a finding that Davis violated KRPC 1.7 because the waiver signed by Davis' client properly informed the client of all potential concurrent conflicts as required by KRPC 1.7(b). Additionally, the hearing panel concluded the ODA presented no evidence to support a violation of KRPC 3.3. The ODA did not file any exceptions to these conclusions.

But the hearing panel did find violations of KPRC 3.5(d) and 8.2(a). First, it found Davis' conduct before Judge Commer was undignified, discourteous, and degrading to the tribunal in violation of KRPC 3.5(d). It also found Davis violated KRPC 8.2(a) when he knowingly or recklessly made statements about Judge Commer's qualifications or integrity in response to Judge Commer's complaint.

Davis does not challenge the facts set forth in transcripts and written emails but filed exceptions to the panel's legal conclusions based on those facts. He challenges the panel's conclusions that (1) his behavior rose to the level of undignified or discourteous conduct degrading to a tribunal and (2) his statements about Judge Commer's integrity were false or in reckless disregard as to their truth or falsity.

55

1. *KRPC 3.5(d) (conduct degrading to tribunal)*

Rule 3.5 bears the title "Impartiality and Decorum of the Tribunal." Its main focus is prohibiting conduct that may improperly influence a judge, jury, witness, etc. A short sentence in subsection (d) is the decorum part of the rule.

"RULE 3.5 Impartiality and Decorum of the Tribunal

"A lawyer shall not:

"(a) give or lend anything of value to a judge, official, or employee of a tribunal except as permitted by the Kansas Code of Judicial Conduct as it may, from time to time be adopted in Kansas, nor may a lawyer attempt to improperly influence a judge, official or employee of a tribunal, but a lawyer may make a contribution to the campaign fund of a candidate for judicial office in conformity with the Kansas Code of Judicial Conduct;

"(b) communicate or cause another to communicate with a member of a jury or the venire from which the jury will be selected about the matters under consideration other than in the course of official proceedings until after the discharge of the jury from further consideration of the case;

"(c) communicate or cause another to communicate as to the merits of a cause with a judge or official before whom an adversary proceeding is pending except:

. . . .

"(d) engage in undignified or discourteous conduct degrading to a tribunal."

There is one comment appended to KRPC 3.5, but it is unrelated to subsection (d).

The corresponding ABA Model Rule of Professional Conduct, MRPC 3.5, also focuses primarily on improper influence. The decorum subsection is set forth in MRPC 3.5(d), which prohibits a lawyer from engaging "in conduct intended to disrupt a tribunal." Unlike our decorum rule, MRPC 3.5(d) includes a mens rea requirement and refers to conduct *disrupting* a tribunal rather than conduct *degrading* a tribunal. But the comments to MRPC 3.5(d) equate disruption to "abusive or obstreperous conduct" as well as "belligerence or theatrics," which closely align with the KRPC 3.5(d) prohibition on conduct degrading a tribunal. Thus, the comment to MRPC 3.5(d) explaining the rule's purpose appears equally relevant to KRPC 3.5(d):

> "The advocate's function is to present evidence and argument so that the cause may be decided according to law. Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants. A lawyer may stand firm against abuse by a judge but should avoid reciprocation; the judge's default is no justification for similar dereliction by an advocate. An advocate can present the cause, protect the record for subsequent review and preserve professional integrity by patient firmness no less effectively than by belligerence or theatrics." Comment [4].

With the comment to MRPC 3.5(d) in mind, we review whether clear and convincing evidence supports the panel's legal conclusion that Davis violated KRPC 3.5(d). Again, our rule has no mens rea component, so by its plain language a lawyer can be held to have violated it by engaging in undignified or discourteous conduct degrading to the tribunal regardless of intent to dishonor the court.

In support of its conclusion that Davis violated KRPC 3.5(d), the hearing panel found the following behavior by Davis to be undignified or discourteous conduct degrading to a tribunal:

57

- Davis interrupted Judge Commer.
- Davis was argumentative with Judge Commer.
- Davis used degrading language when he said the court "should be ashamed of" its ruling, the court was committing an "injustice" and was "wrong," and that Davis' client was being "railroaded" by the court's ruling.

We include the hearing transcript to provide context to the panel's factual findings and legal conclusions. The first excerpt provides context for when Davis said, "What is happening to [Ja.H.] here is an injustice this court *should be ashamed of*." (Emphasis added.)

"THE COURT: Mr. Davis, you are also here because your prior client didn't follow through with their contractual offer of ninety thousand dollars.

"MR. DAVIS: Your Honor, I mean this as respectfully as I need to. I am an attorney. I represent who I represent. [Ja.H.] had no contact to Minter[*sic*] Capital. This is two separate arm's length transactions. Whatever my previous client did or did not do is irrelevant to [Ja.H.]. What is happening here I stepped in for the record pro bono because I saw an injustice happening to [Ja.H.]. It is a grave injustice. You changed the rules for her and do not change the rules for him. He has offered more money. Either accept his money for more money or adjust things and order this property to be marketed. We can't for one party. That's essential for our justice system, Your Honor. What's good for the goose is good for the gander.

"Either accept the higher offer and bypass the process or order the process you ordered that they are asking you.

"I want to emphasize because they asked you to step around the process with Minter[*sic*] Capital these are the parties that knew the order. Mr. Ayesh ignored it quite

58

frankly and should be sanctioned, Your Honor. That's a whole other point. He ignored your order and allowed her to enter a contract with Minter[*sic*] Capital when you ordered it. *What is happening to [Ja.H.] here is an injustice this court should be ashamed of.*

"THE COURT: Mr. Ayesh, I want to ask you in the hearing that was on done on September 3rd in that hearing on September 3rd you filed a motion for that hearing that referenced a sale to Minter[*sic*] Capital. Had [M.H.] signed that order before that was presented to the court?" (Emphasis added.)

The second excerpt is from the last two pages of the hearing transcript, after the court issued its ruling.

"MR. DAVIS: May I respectfully ask you to list [the home] for ten days even though it still had not closed under [the] contract [with Northbound]? *What you are doing is an injustice, Your Honor.*

"THE COURT: You said that before, Mr. Davis. I made my ruling.

"MR. DAVIS: I want you to know *what you are doing is wrong to [Ja.H.]. I want it on the record what you are doing is wrong.*

"THE COURT: I'm not going to argue with you. I've made my ruling.

"MR. DAVIS: *You made the ruling you believe is appropriate. I want it on the record I believe what you are doing is wrong.*

"THE COURT: You are arguing.

"MR. DAVIS: For more time listed seven to ten days no harm whatsoever. That would just prove the fair value of the property. *[Ja.H.] is being railroaded here, Your Honor.* It is not right. I want it on the record.

59

"THE COURT: Mr. Davis.

"MR. DAVIS: It is not right.

"THE COURT: You said that. You made your argument, Mr. Davis. That is one of the problems with these Web[Ex] remote hearings that your conduct just now was in contempt of the court's ruling because you are arguing with the court. I explained why I was making this ruling when I indicated to you I will be unavailable.

"MR. DAVIS: You can correct this, Your Honor. Your unavailability shouldn't affect [Ja.H.]. That's unjust.

"THE COURT: Mr. Davis, if you were present in the courtroom I would likely be finding you in contempt of court for direct contempt." (Emphases added.)

We italicized the statements made by Davis on which the hearing panel relied to conclude Davis engaged in undignified or discourteous conduct degrading to a tribunal. We also italicized Davis' remark during this exchange where Davis acknowledged that Judge Commer made the ruling that the judge believed was appropriate.

Judge Commer's testimony at the disciplinary hearing also provides context to the panel's legal conclusions. Although most of Judge Commer's testimony related to facts surrounding the potential conflict of interest violation, the ODA questioned Judge Commer about Davis' demeanor during the hearing. Judge Commer generally said it was fine until the last few pages of the transcript, when Davis appeared to become aggressive and assertive.

60

"I noticed that he was not allowing me to speak, and sometimes I will start to speak and if the—if the person that I'm seeking to say something to continues I—I pause trying to be particularly respectful of them in a hearing, maybe sometimes overly, but I found that to be more probably a better approach to use as a judge so that the person gets to say what they want to say."

When asked about Davis' comment that the court would be committing a grave injustice against his client, Judge Commer said:

"I think [he] was beginning to become more assertive because he probably seemed to have the aggression that I was, 'um, not likely to grant his motion maybe. And, 'um, he was—I—I perceived it kind of to be an indication that—that these two people should be—and I was not giving [Ja.H.] equal consideration with [M.H.], 'um, although he was not party to the hearing or the trial that occurred back in April when I had gotten information about both of these persons that was still present in my mind and available."

And when asked about Davis' demeanor as reflected in the final two pages of the hearing transcript, Judge Commer said:

"[O]ne of the things that judges do not expect is argument after you've made your ruling. 'Um, and he—he was continuing to be assertive and to repetitively call my—call the decision an injustice to his client, and—and, 'um, being very insistent in the manner of speech."

As for Davis' tone of voice, Judge Commer said "[Davis] was speaking probably with more passion and emotion and volume than he had, for instance, at the start of the hearing." And when asked whether Davis' actions prevented him from maintaining control of the hearing, Judge Commer said:

61

"I was intending to kind of get him to stop his continued assertions with my statements that said, 'You've said that before and you're'—'I'm not going to argue with you,' and that—indicating that he was arguing with the decision. And I would say—I would say, yes, to some extent."

On cross-examination, Judge Commer was asked why he equivocated in the disciplinary complaint he filed against Davis by alleging Davis "maybe" violated KRPC 3.5(d). He responded:

"because I didn't know if the Disciplinary Administrator Panel would consider telling the judge that it was an injustice repeatedly or that his client had been railroaded, fit the lack of decorum or the lack of, 'um, respect for the process of proceeding in the court. My concern particularly with that was that this—this man, [Ja.H.], was hearing it, hearing those statements. I can usually take some things and let them slide off my back, but my concern was more the impression being given to these—this litigant that the court system is unjust and the court system will allow somebody to railroad them through."

Davis claims his conduct, in context, does not rise to the level of a KRPC 3.5(d) violation. In support, Davis argues the conduct at issue was limited to only one of the three hearings where Davis appeared before Judge Commer in the matter. Davis also argues he engaged in the identified conduct solely to advocate for his client's interest and not to degrade the court. We are not persuaded by either of these arguments. First, that a lawyer adheres to the professional code of conduct two-thirds of the time is irrelevant to deciding whether clear and convincing evidence of a KRPC 3.5(d) violation exists. Second, and as we stated earlier, KRPC 3.5(d) does not have a mens rea requirement, so the reason *why* Davis engaged in the conduct at issue is immaterial to deciding whether Davis' behavior is undignified or discourteous conduct degrading to a tribunal.

62

Davis also points to some of our prior decisions interpreting and applying KRPC 3.5(d), which he says suggest that violations are limited to cases with worse facts, e.g., use of profanity, physical threats, or other threats. Cf. *In re Johnston*, 316 Kan. 611, 665, 520 P.3d 737 (2022) (where the attorney repeatedly accusing the bench and bar of collusion and racketeering, arguing with the judge, talking over and threatening to file litigation); *In re Rumsey*, 301 Kan. 438, 440, 442, 343 P.3d 93 (2015) (attorney called opposing counsel a "dirty bitch" and he had a history of engaging in similar conduct towards female attorneys); *In re Romious*, 291 Kan. 300, 309, 240 P.3d 945 (2010) (attorney shouted profanities at court staff, accused a judge of being a pedophile, brawled with U.S. Marshals, was rude, and disruptive towards court personnel in state and federal courts). But contrary to Davis' suggestion, we have never construed KPRC 3.5(d) to require, and its plain language does not dictate, that a lawyer use profanity or make threats to violate the rule. See, e.g., *In re Berry*, 274 Kan. 336, 340-42, 346, 352-53, 50 P.3d 20 (2002) (although lawyer never used profanity or threatening language, court concluded lawyer violated KRPC 3.5[d] by continuing to argue with judge after judge announced ruling). To that end, each disciplinary case is unique and must be resolved in light of its own facts.

Finally, Davis points to our discussion of KRPC 3.5(d) in *In re Huffman*, 315 Kan. 641, 681-83, 509 P.3d 1253 (2022), to support his argument. In that case, respondent made statements in two motions for reconsideration that (1) implied the judge discriminated against her clients based on race or socioeconomic status, (2) implied the judge decided the issues in the case based on power rather than truth, and (3) accused the judge of treating the attorney differently than opposing counsel. The hearing panel concluded this conduct violated KRPC 3.5(d). But we disagreed.

63

"Taken together, her testimony demonstrates a serious lack of judgment in making these comments and statements. But we are also cognizant that judges and courts are not above criticism—even harsh criticism—by lawyers vigorously advocating sometimes unpopular causes on behalf of marginalized people. And balancing this against the equally important need for a decorous and orderly courtroom is an inexact endeavor at best. Given this, a majority of the court holds Huffman's statements do not rise to the heightened standard necessary to support the panel's conclusion that she violated KRPC 3.5(d) and KRPC 8.2(a). In reaching that decision the majority considered and weighed as significant the fact Judge Marten himself did not take affront to Huffman's comments or invoke contempt at the time. A minority of the court would have found violations of these two rules." 315 Kan. at 682-83.

Davis says we should reach the same result here. We stand by our analysis in *Huffman*. But a majority of the court finds application of the *Huffman* analysis to the facts here results in a finding that Davis violated KRPC 3.5(d). In concluding Huffman's conduct did not constitute clear and convincing evidence to support a KRPC 3.5(d) violation, we "considered and weighed as significant the fact Judge Marten himself did not take affront to Huffman's comments or invoke contempt at the time." 315 Kan. at 683. Judge Marten did not file a disciplinary complaint against Huffman.

The opposite is true here. It was Judge Commer himself who initiated and filed the complaint against Davis alleging a possible KRPC 3.5(d) violation. And Judge Commer testified he did take affront to Davis' conduct because the parties, not just the lawyers, heard Davis' accusation that the court railroaded his client by deciding the case in a shameful and unjust manner inconsistent with the applicable law. In this context, Judge Commer believed Davis' conduct was degrading to the tribunal—not necessarily to him personally—but to the concept of an independent judiciary as a whole.

64

Upon review of the entire record, a majority of the court finds clear and convincing evidence supports the panel's conclusion that Davis violated KRPC 3.5(d) by engaging in undignified or discourteous conduct degrading to a tribunal. In reaching this decision, the majority considered and weighed as significant the fact that Judge Commer initiated and filed the complaint against Davis and that Judge Commer took affront to Davis' conduct as degrading to the tribunal in the sense that it undermined the concept of an independent judiciary. A minority of the court would find no violation of KRPC 3.5(d) based on a lack of clear and convincing evidence to support the violation.

2. *KRPC 8.2(a) (false statement about judge's integrity)*

KRPC 8.2(a) prohibits a lawyer from making "a statement that the lawyer knows to be false or with reckless disregard as to its truth or falsity concerning the qualifications or integrity of a judge." The hearing panel found Davis violated the rule by knowingly or with reckless disregard making false statements about Judge Commer's qualifications and integrity in his written response to Judge Commer's complaint. The panel identified the following false statements about Judge Commer's qualifications and integrity made by Davis:

- Judge Commer's bar complaint alleging Davis had a conflict of interest was frivolous and untruthful because Judge Commer knew when he filed it that Davis had no conflict of interest;

- Judge Commer filed the bar complaint alleging Davis had a conflict of interest in order to retaliate against Davis for exposing Judge Commer's decision as wrong, unfair, unjust, and made in order to accommodate the judge's personal vacation plans; and

- Judge Commer filed the bar complaint alleging Davis had a conflict of interest to deter Davis from appealing the judgment.

In support of its conclusion that Davis' statements about Judge Commer were false, the panel cited Judge Commer's testimony from the disciplinary hearing stating he did not file the bar complaint against Davis to retaliate or to deter Davis from appealing. To the contrary, Judge Commer testified he believed there was a substantial likelihood Davis committed an ethical violation when he filed his complaint.

In support of its conclusion that Davis knowingly or recklessly made the false statements about Judge Commer's qualifications and integrity, the panel cited to Davis' own testimony at the disciplinary hearing:

"I can't tell you what Judge Commer's motives are. I can tell you what I thought they were that day. I can tell you what I think they were today and those aren't the same thing because things have happened between now and that day. . . .

. . . .

" . . . And, you know, that's what I said, what I said when I said. Today it was dumb. Shouldn't have sent [the email]. And I would take it back every time, 10 out of 10 times, if I got asked the question."

A majority of the court finds clear and convincing evidence supports the panel's conclusion that Davis violated KRPC 8.2(a) by knowingly or recklessly making false statements about Judge Commer's qualifications and integrity. A minority of the court

66

would find no violation of KRPC 8.2(a) based on a lack of clear and convincing evidence to support the violation.

## C. *T.R. Complaint*

The ODA charged Davis with violating KRPC 1.15(b) (failing to promptly deliver funds belonging to a third person), KRPC 4.1(a) (2022 Kan. S. Ct. R. at 403) (truthfulness in statements to others), and KRPC 4.4(a) (2022 Kan. S. Ct. R. at 406) (respect for rights of third persons). The hearing panel found no clear and convincing evidence to establish any of these violations. The ODA filed exceptions, arguing the panel ignored the clear and convincing evidence it presented.

We agree with the panel that the ODA's evidence is not clear and convincing. As for the settlement agreement and placing the funds in his trust account, the panel found Davis had a duty to protect his client's legal interests and gather adequate evidence to confirm whether T.R. was the judgment debtor before releasing the funds. The panel noted T.R. could have filed a motion with the court at any time but chose instead to negotiate with Davis. The panel also noted Davis tried to return the funds through attorney Mark Logan, who did not respond, and given the garnishee's anger and rather aggressive interactions with Davis, Davis was justified in wanting to protect himself and his client. Finally, the panel said that while Davis never reached a conclusion with 100% certainty that he had garnished the wrong person's earnings, he and his client ultimately concluded that they should refund the collected amounts to T.R. Thus, there was no clear and convincing evidence that the "inconsistent results" from the investigation language was a knowingly false statement.

67

D.  *Summary of Violations*

We have reviewed the hearing panel's findings of fact and conclusions of law on Davis' rule violations and summarize our conclusions below.

In the Ragsdale complaint, a majority of the court finds clear and convincing evidence supports the panel's conclusion that Davis violated

- KRPC 1.15(a) (safekeeping property) by placing his client's payment for the cost of the deposition in his operating account instead of his trust account.

- KRPC 3.1 (meritorious claim in good faith) by defending against Ragsdale's suit in small claims court seeking payment of the deposition invoice on grounds that he did not owe the $37.50 appearance fee when he acknowledged he owed it both before and after the court appearance. *A minority of the court would find no violation of KRPC 3.1.*

- KRPC 4.1(a) (truthfulness in statements to others) by falsely telling Ragsdale he had placed a check in the mail to pay the deposition invoice. *A minority of the court would find no violation of KRPC 4.1(a).*

- KRPC 4.4(a) (respect for rights of third persons) by telling Ragsdale over a period of three months that he planned to pay the deposition invoice. *A minority of the court would find no violation of KRPC 4.4(a).*

- KRPC 8.1 (false statement in disciplinary matters) by falsely telling disciplinary investigator that he sent a check to Ragsdale for the $37.50 appearance fee and

falsely telling former Disciplinary Administrator two years later that his client sent the $37.50 appearance fee directly to the court reporter.

- KRPC 8.4(c) (dishonest conduct) (the conduct establishing this violation is indistinguishable from the conduct establishing the KRPC 4.1[a] and 8.1 violations).

In the Judge Commer complaint, a majority of the court finds clear and convincing evidence supports the panel's conclusion that Davis violated

- KRPC 3.5(d) (conduct degrading to tribunal) by engaging in undignified or discourteous conduct degrading to the concept of a fair and independent judiciary —in front of his client and other parties to the litigation—when he accused the court of railroading his client and deciding the case in a shameful and unjust manner inconsistent with the applicable law. *A minority of the court would find no violation of KRPC 3.5(d).*

- KRPC 8.2(a) (false statement about judge's integrity) by stating Judge Commer filed the bar complaint alleging Davis had a conflict of interest not based on the facts, but solely to retaliate against Davis for exposing Judge Commer's decision as wrong, unfair, unjust, and made to accommodate the judge's personal vacation plans. *A minority of the court would find no violation of KRPC 8.2(a).*

Finally, we find no clear and convincing evidence to establish any violations in the T.R. complaint.

The remaining question is the appropriate discipline. We generally look to the American Bar Association Standards for Imposing Lawyer Sanctions to aid in determining discipline. That framework considers "four factors in determining punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors." *In re Hodge*, 307 Kan. 170, 231, 407 P.3d 613 (2017). The panel considered these same factors.

As for the duty violated, the panel determined Davis "violated his duty to his client L.Y." and his duty "to the public, to the legal system, and to the legal profession." But clear and convincing evidence does not support the finding that Davis violated a duty to L.Y. Although Davis admitted violating KRPC 1.15(a) requiring a lawyer to hold property of clients or third persons separate from the lawyer's own property, the evidence does not support a finding that L.Y. owned the funds when she paid for deposition costs already incurred.

As to mental state, the panel found Davis intentionally told Ragsdale the check was in the mail when it was not, intentionally told the investigator that he sent a check to Ragsdale for the $37.50 appearance fee when he had not, and intentionally told the former Disciplinary Administrator two years later that his client sent the $37.50 appearance fee directly to the court reporter when his client had not. It found Davis knowingly placed his client's payment in his operating account, knowingly denied owing the $37.50 deposition appearance fee in small claims court, knowingly delayed payment to Ragsdale over three months, knowingly engaged in undignified conduct degrading to the tribunal, and knowingly made false statements about Judge Commer's integrity.

As for injury, the panel found wasted time and energy (Ragsdale pursuing small claims suit), wasted resources (small claims court and ODA), and conversion of funds (client L.Y.). Again, we find clear and convincing evidence does not support a finding that Davis converted funds owned by L.Y. or that L.Y. suffered any injury as a result of Davis placing those funds in his operating account rather than his trust account. We find injury to the small claims court and the ODA in terms of wasted resources to be de minimis. This leaves a singular injury suffered by Ragsdale in terms of wasted time and energy in pursuing the small claims suit.

In terms of aggravating factors, the panel found the violations in the Ragsdale complaint and the Judge Commer complaint did not establish a pattern of conduct and thus was not an aggravating factor. The panel found aggravating but gave reduced weight to Davis' prior misconduct when he was a youth due to its remoteness in time, the fact that Davis self-reported the misconduct, and the fact that the Kansas Board of Law Examiners chose to allow Davis to take the bar exam despite the misconduct. The panel found aggravating the fact that Davis committed multiple offenses in the current disciplinary case and his conduct included false statements motivated by dishonesty and selfishness. The ODA argues the violations establish a pattern of conduct and takes exception to giving Davis' prior misconduct reduced weight. We are not persuaded by the ODA's arguments.

The panel found four mitigating factors, two of which it found compelling. The first compelling mitigating factor was Davis' *physical* health condition related to his heart transplant. The second was his personal and emotional condition related to his heart transplant. The panel also found Davis' inexperience in the practice of law and his good character and reputation in the community to be mitigating factors. The ODA takes

71

exception to the panel's finding that the physical and mental disability conditions suffered by Davis were compelling factors for mitigation purposes. Specifically, the ODA argues that to find Davis' physical and mental disability conditions compelling factors for mitigation purposes, the panel needed to establish a causal connection between the conditions and the misconduct. We disagree and find no support in the ABA standards or our caselaw for the ODA's position.

Based on its assessment of the four punishment factors, the panel recommends Davis be suspended for 90 days and then placed on probation for two years. The panel also recommends Davis undergo a psychological evaluation and follow all recommendations resulting from the evaluation. The ODA recommends Davis be indefinitely suspended. Davis seeks a published censure or that he be suspended for an unspecified period of time to be stayed while he is placed on probation.

"In any given case, this court is not bound by the recommendations from the hearing panel or the Disciplinary Administrator. 'Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case.' [Citations omitted.]" *In re Hodge*, 307 Kan. at 230.

After carefully considering the evidence presented, the exceptions filed by Davis and the ODA, and the ABA Standards for Imposing Lawyer Sanctions, a majority of this court holds that published censure is the appropriate discipline. In deciding on published censure as the appropriate discipline, we rely on ABA Standard 5.13 (reprimand generally appropriate when lawyer knowingly engages in conduct that involves dishonesty, fraud, deceit, or misrepresentation). See *In re Spencer*, 317 Kan. 70, 86, 524 P.3d 57 (2023) (published censure appropriate sanction for lawyer who committed "a misdemeanor that involved dishonesty, fraud, deceit, or misrepresentation which

adversely reflected on his fitness to practice law but did not seriously adversely reflect on his fitness to practice law"). We also find Davis' physical and mental condition related to his heart transplant during the relevant time period to be a compelling mitigating factor in deciding on published censure as the appropriate discipline. A minority of the court would impose more severe discipline.

CONCLUSION

IT IS THEREFORE ORDERED that Richard K. Davis is disciplined by published censure to be published in accordance with Supreme Court Rule 225(a)(5) (2023 Kan. S. Ct. R. at 281) for violations of KRPC 1.15(a), 3.1, 4.1(a), 4.4(a), 8.1(a), 8.4(c), 3.5(d), and 8.2(a).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.

\* \* \*

STEGALL, J., concurring: My view of this case is captured in the phrase "a minority of the court would . . ." in the opinion above (with the exception of the discipline imposed). Most of the time that is sufficient in an attorney discipline case. I take the unusual step of writing today to emphasize the danger we court with our ruling on the Judge Commer complaint. Respondent's argument that Judge Commer's vacation plans influenced his decision was within the realm of plausibility and grounded in the actual exchange that took place. But our ruling today goes a long way toward making it unethical for attorneys to push back against judicial actions they consider either wrong, unjust, or unethical. Certainly decorum toward the tribunal must be balanced with an

73

attorney's obligation to zealously advocate for his or her client. Judicial tolerance of criticism fosters such a balance and is integral to our adversarial system.

Perhaps more importantly, it does the judicial branch no favors to present publicly with a collective glass chin. Rather than preserving a reputation for fairness and integrity, oversensitivity to criticism and circling-the-wagons tends to give the impression that judges can dish but they can't take. This perception can undermine the rule of law if it lends credence to the worry harbored by some that judges and other powerful actors in our democracy are protected from accountability by a system not based on law but on power imbalances. To ward off such destabilizing suspicions, I would give significantly more ethical latitude to attorneys arguing their clients' causes in court. And when lines are crossed, contempt proceedings are a better tool in the judge's tool-belt for maintaining the dignity and decorum of the judicial system.

WILSON and WALL, JJ., join the foregoing concurring opinion.